Dollar Savings & Trust Co., Exr., Appellee, *v.* City of Youngstown, Appellant.

226

(No. 4846—Decided September 16, 1969.)

*Messrs. Pfau, Pfau, Comstock & Springer,* for appellee.

*Mr. Patrick J. Melillo,* director of law, and *Mr. William J. Higgins,* for appellant.

JOHNSON, J. This is an appeal on questions of law from a judgment of the Common Pleas Court.

The action arises from the death of plaintiff's decedent who was struck and killed November 10, 1965, in a marked crosswalk.

Commerce Street, in Youngstown, runs in an east-west direction. On the southwest corner of Commerce Street and Wick Avenue is the main office of The Dollar Savings & Trust Company. The Central Square Garage, a multistory parking facility, is located on the northwest corner of the intersection. Immediately west of The Dollar Savings and Trust Company is the location of Strouss', a major downtown department store. The rear entrance

to Strouss' is approximately opposite the main entrance to the Central Square Garage.

In 1949 the city of Youngstown did, by ordinance No. 50347, create a mid-block pedestrian crossing approximately opposite the two entrances described above. Parallel white lines, nine feet apart, running north and south, were painted upon the roadway from curb to curb. Diagonal white lines were painted between the parallel lines. Above both the east and west travel lanes a cable was stretched, upon which were hung signs directing automobile traffic to yield to pedestrians in the crosswalk. At both ends of the crosswalk signs were erected indicating to pedestrians that it was a crosswalk.

The city of Youngstown maintained the crosswalk since 1949, and periodically repainted the white lines on the asphalt road surface. The last painting was done in late 1964.

A city patrolman was on beat duty in the vicinity of the corner of Wick and Commerce Streets, and one of his principal duties was to maintain the free flow of traffic through the intersection. He also provided assistance to motorists driving into or out of the garage, and assisted pedestrians in their daily use of the crosswalk. He worked the hours from 8 a. m. to 4 p. m. as a city patrolman. Thereafter, still in city uniform, he worked as an employee of the Central Square Garage to, in his words, "control ingress and egress to the garage." On the days the stores had evening hours he worked from 4 p. m. to 9:30 p. m. On all other days he worked from 4 p. m. to 5:30 p. m. This policeman had worked the same beat for approximately eighteen years. He was performing these duties on November 10, 1965.

Mary Lou Cahill was an employee of The Dollar Savings & Trust Company, having worked for the trust department of that institution for a period of six years prior to the events leading up to her death. She was a widow, thirty-nine years of age, the sole support of her four minor children and her seventy-year-old mother.

It was her custom to park her car in the Central

Square Garage each morning and, upon leaving the garage, to use the pedestrian crosswalk and cross over to the south side of Commerce Street, where she entered the bank to go to work.

On March 4, 1965, the city of Youngstown passed ordinance No. 73368, wherein the crosswalk in question was eliminated and a fine was provided for those who violated the ordinance. Shortly after the ordinance was passed, the cable holding the caution signs for vehicular traffic was removed and the pedestrian signs at either end of the crosswalk were taken down. No sign was erected designating that pedestrian crossing was no longer permitted, nor was any effort made to eradicate the painted white lines on the surface of the roadway.

John Pletnick, the head of the Department of Traffic Engineering, testified that no effort was made to remove or paint over the white lines, that time and weather would eliminate them.

At 8:30 a. m., November 10, 1965, Mary Lou Cahill parked her car at the Central Square Garage. She left the garage and started to cross over the crosswalk to the south. She was walking at the right side of Virginia Adams. A car driven by Rosalie Craig approached the crosswalk from the left, driving on the inside lane preparatory to making a left turn. Virginia Adams stopped before the Craig car entered the crosswalk. Mary Lou Cahill walked into the path of the Craig car and was struck.

Mrs. Craig testified that she had learned some months before of the elimination of the crosswalk, and that she did not slow down as she approached it.

On trial to a jury, the estate of Mary Lou Cahill was awarded a substantial verdict, from which the city of Youngstown prosecutes this appeal.

Excellent briefs have been supplied by counsel for the estate and the attorney for the city.

We are here concerned with the application of Section 723.01, Revised Code, to the fact situation in question. It reads:

"Municipal corporations shall have special power to

regulate the use of the streets. The legislative authority of such municipal corporation shall have the care, supervision, and control of public highways, streets, avenues, alleys, sidewalks, public grounds, bridges, aqueducts, and viaducts within the municipal corporation, and shall cause them to be kept open, in repair, *and free from nuisance.*" (Emphasis added.)

At the outset, it is clear that the city in its supervision and control of the street in question and the crosswalk thereon was engaged in a governmental function and is thus immune from tort liability unless its actions constitute a nuisance.

As defined by Judge Hart in the landmark case of *Taylor* v. *Cincinnati,* 143 Ohio St. 426, wherein Section 3714, General Code, the predecessor statute of Section 723.01, Revised Code, was in question, two types of nuisances fall within the import of the statute. Paragraph two of the syllabus reads as follows:

"Absolute nuisance, for which strict liability or liability without fault is imposed by law, may be defined as a distinct civil wrong arising or resulting from the invasion of a legally protected interest, and consisting of an unreasonable interference with the use and enjoyment of the property of another; the doing of anything or the permitting of anything under one's control or direction to be done without just cause or excuse, the necessary consequence of which interferes with or annoys another in the enjoyment of his legal rights; the unlawfully doing of anything or the permitting of anything under one's control or direction to be done, which results in injury to another; or the collecting and keeping on one's premises anything inherently dangerous or likely to do mischief, if it escapes, which, escaping, injures another in the enjoyment of his legal rights."

Judge Hart defined a qualified nuisance in paragraph three of the syllabus as follows:

"As distinguished from absolute nuisance, a qualified nuisance or nuisance dependent upon negligence consists of anything lawfully but so negligently or carelessly done

or permitted as to create a potential and unreasonable risk of harm, which, in due course, results in injury to another."

The special charges before argument and the general charge after argument were couched in the language of negligence, and the jury was instructed to make a determination whether a nuisance predicated on negligence did in fact exist. Were the charges as given correct?

What, if any, were the negligent acts of the city by which they should have anticipated the injury to the decedent?

Section 4511.01, Revised Code, in pertinent part is as follows:

"(KK) 'Crosswalk' means:

"(1) That part of a roadway at intersections ordinarily included within the real or projected prolongation of property lines and curb lines or, in the absence of curbs the edges of the traversable roadway;

"(2) Any portion of a roadway at an intersection or elsewhere, distinctly indicated for pedestrian crossing by lines or other markings on the surface;

"(3) Notwithstanding subdivisions (1) and (2) of division (KK) of this section, there shall not be a crosswalk *where local authorities have placed signs indicating no crossing.*" (Emphasis added.)

The city argues that by properly adopted ordinance the crosswalk was duly eliminated and decedent was in violation of a city ordinance in the use of same. Her illegal action being negligence per se.

We feel that the city's position is untenable. By statutory definition a crosswalk existed on the travelled portion of the highway even after the passage of the ordinance eliminating same. The city's action could not override the legislative mandate wherein crosswalks are created.

Section 4511.06, Revised Code, provides:

"Sections 4511.01 to 4511.78, inclusive, * * * of the Revised Code shall be applicable and uniform throughout this state and in all political subdivisions and municipal corporations therein, and *no local authority shall enact or enforce any rule or regulation in conflict with such sections.*" (Emphasis added.)

A pedestrian user's action under such circumstances would not be negligence per se. Whether plaintiff was contributorily negligent was a question of fact for the jury. See *Ornella* v. *Robertson*, 14 Ohio St. 2d 144.

The author has searched diligently for a comparable fact situation in the reported cases in Ohio or other jurisdictions. That search has been in vain.

The question thus arises, in the exercise of its governmental function relative to the control and use of the streets and open spaces, what duty, if any, devolves upon a city in its elimination of crosswalks over its public highways?

By definition the Legislature has described what constitutes a crosswalk in Ohio. Thereby a citizen of Cleveland or Cincinnati upon approaching such delineated area over the travelled portion of any highway can be assured in his use of same. Where he observes the markings defined, or where he crosses at an intersection, he has assurance that public authority has designated such spot for pedestrian crossing. The single caveat is the erection by the public authority of a sign *indicating no crossing*.

It is not logical to conclude that the legislative intent indicated in Section 4511.01 (KK), Revised Code, and Section 4511.06, Revised Code, was directed solely to the uniform and safe creation of crosswalks in the state, and is to be construed as to being wholly silent on their elimination.

We think it inherent in a logical construction of the statute that a duty devolves upon the local authority to eliminate crosswalks by acts clearly inferred in the statute. That is to say, that if a duly created crosswalk is to be eliminated by a local authority, the ordinance declaring same must be followed immediately by the erection of signs indicating "no crossing."

If the lines are to remain on the travelled portion of the street the city has a duty to erect signs indicating *there is no crosswalk*. It would be good practice, though not mandated, to paint out or obliterate the markings so that they are no longer discernible.

A reading of the statute indicates (Section 4511.01 (KK) (1) that *at every intersection* there is a crosswalk

within the prolongation of the curb or edge of the highway line and property line.

There is a second group of crosswalks either at intersections or at mid-block which is created by markings on the street surface (Section 4511.01 (KK) (2)).

Only where signs have been erected indicating "no crossing" can these legislatively-created crosswalks be eliminated by the local authority.

Heretofore, in a long line of decisions, the Supreme Court of this state has held that Section 723.01, Revised Code, is to be strictly construed in favor of municipalities in the exercise of governmental functions.

In a recent pronouncement in *Gabris* v. *Blake*, 9 Ohio St. 2d 71, the court said, in the third paragraph of the syllabus:

"Section 723.01, Revised Code, requiring municipalities, *inter alia*, to keep their streets, highways and public grounds open, in repair and free from nuisance, *embraces only those conditions affecting the actual physical conditions existing in or on highways*, streets and public grounds themselves." (Emphasis added in part.)

In the application of that holding to the within facts, we conclude that the physical condition of lines of paint clearly marking a crosswalk *on* a roadway comes within its intent and meaning.

This physical condition is far more dangerous, in our opinion, than the typical hole or defect to be found on sidewalks, highways or public grounds, which have frequently been held to be nuisances. In those instances there is, at least, the chance of observation, and one confronting them might be forewarned.

The physical markings of paint on a crosswalk, which has been purportedly eliminated by city ordinance, are an invitation to the uninformed who can have no way of knowing of the trap which awaits.

We are further buttressed in our conclusion by the provisions of Section 4511.16, Revised Code, which indicate the legislative intent as to markings *upon* a highway. As pertinent, it reads:

"No person shall place, * * * upon * * * any highway any unauthorized * * * marking * * * which purports to be * * * a traffic control device * * *, or which attempts to direct the movement of traffic * * *.

"Every such prohibited * * * marking * * * *is a public nuisance*, and the authority having jurisdiction over the highway may remove the same or cause it to be removed." (Emphasis added.)

We do not, of course, find that a person, as used therein (and as defined in Section 4511.01 (V)), is intended to mean a municipal corporation, but we do conclude that improper crosswalk markings on a highway caused by the actions of a municipal corporation can be as great a danger as those made by its private citizens. And thus the legislative concern is expressed in Section 4511.16, Revised Code, and a provision for penalty is made for violation in subsequent sections.

We conclude that, from the evidence, the jury properly found that the city was negligent in the maintenance of such a qualified nuisance, and that such negligence was the proximate cause of the death of Mary Lou Cahill.

We have examined the other errors assigned, and find the same not to be well taken.

The judgment of the trial court is, therefore, affirmed.

*Judgment affirmed.*

LYNCH, P. J., and O'NEILL, J., concur.